WILLIAMS, Senior Circuit Judge,
dissenting:
Section 5 of the Voting Rights Act imposes rather extraordinary burdens on “covered” jurisdictions — nine states (and every jurisdiction therein), plus a host of jurisdictions scattered through several other states. See Voting Section, U.S. Dep’t of Justice, Section 5 Covered Jurisdictions, http://www.justice.gov/crt/about/vot/sec_5/ covered.php (last visited May 9, 2012) (listing the covered jurisdictions). Unless and until released from coverage (a process discussed below), each of these jurisdictions must seek the Justice Department’s approval for every contemplated change in election procedures, however trivial. See 42 U.S.C. § 1973c. Alternatively, it can seek approval from a three-judge district court in the District of Columbia. See id. Below I’ll address the criteria by which the Department and courts assess these proposals; for now, suffice it to say that the act not only switches the burden of proof to the supplicant jurisdiction, but also applies substantive standards quite different from those governing the rest of the nation.
Section 4(b) of the act states two criteria by which jurisdictions are chosen for this special treatment: whether a jurisdiction had (1) a “test or device” restricting the opportunity to register or vote and (2) a voter registration or turnout rate below 50%. See 42 U.S.C. § 1973b(b). But § 4(b) specifies that the elections for which these two criteria are measured must be ones that took place several decades ago. The freshest, most recent data relate to conditions in November 1972 — 34 years before Congress extended the act for an *885 other 25 years (and thus 59 years before the extension’s scheduled expiration). See id. The oldest data — and a jurisdiction included because of the oldest data is every bit as covered as one condemned under the newest — are another eight years older. See id.
Of course sometimes a skilled dart-thrower can hit the bull’s eye throwing a dart backwards over his shoulder. As I will try to show below, Congress hasn’t proven so adept. Whether the criteria are viewed in absolute terms (are they adequate in themselves to justify the extraordinary burdens of § 5?) or in relative ones (do they draw a rational line between covered and uncovered jurisdictions?), they seem to me defective. They are not, in my view, “congruent and proportional,” as required by controlling Supreme Court precedent. My colleagues find they are. I dissent.
Although it is only the irrational coverage formula of § 4(b) that I find unconstitutional, it is impossible to assess that formula without first looking at the burdens § 5 imposes on covered jurisdictions. Any answer to the question whether § 4(b) is “sufficiently related to the problem it targets,” Northwest Austin Municipal Utility Dist. No. One v. Holder, 557 U.S. 193, 129 S.Ct. 2504, 2512, 174 L.Ed.2d 140 (2009), that is, whether it is “congruent and proportional,” must be informed by the consequences triggered by § 4(b). (I agree with the majority that Northwest Austin “send[s] a powerful signal that congruence and proportionality is the appropriate standard of review.” Maj. Op. at 859.)[1] The greater the burdens imposed by § 5, the more accurate the coverage scheme must be. If, for example, § 5 merely required covered jurisdictions to notify the Justice Department of an impending change in voting procedures, without giving the Department power to delay or thwart implementation, even a rather loose coverage formula would likely appear proportional.
But § 5 requires much more than notice. For covered jurisdictions, it mandates anticipatory review of state legislative or administrative acts, requiring state and local officials to go hat in hand to Justice Department officialdom to seek approval of any and all proposed voting changes. See 42 U.S.C. § 1973c(a). Since its inception, even supporters of the Voting Rights Act have recognized that the preclearance regime was particularly “strong medicine” for a particularly extreme problem. Voting Rights Act: Hearings on H.R. 6400 Before Subcomm. No. 5 of the House Comm, on the Judiciary, 89th Cong. 110 (1965) (statement of Rep. Chelf). When it first upheld the VRA, the Supreme Court recognized it as a “complex scheme of stringent remedies” and § 5 in particular as an “uncommon exercise of congressional power.” South Carolina v. Katzenbach, 383 U.S. 301, 315, 334, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). And only a few years ago the Supreme Court reminded us that the federalism costs of § 5 are “substantial.” Northwest Austin, 129 S.Ct. at 2511.
A critical aspect of those costs is the shifted burden of proof (a matter I’ll dis *886 cuss below in the realm of its most significant application). So too is the section’s broad sweep: § 5 applies to any voting change proposed by a covered jurisdiction, without regard to kind or magnitude, and thus governs many laws that likely could never “deny or abridge” a “minority group’s opportunity to vote.” See 42 U.S.C. § 1973c(a); Allen v. State Bd. of Elections, 393 U.S. 544, 566, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (“The legislative history on the whole supports the view that Congress intended to reach any state enactment, which altered the election law of a covered State in even a minor way.”). This obvious point is underscored by the miniscule and declining share of covered jurisdictions’ applications that draw Justice Department objections — with only five objections for every ten thousand submissions between 1998 and 2002. See Richard L. Hasen, Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act After Tennessee v. Lane, 192 Ohio St. L.J. 177, 192 & fig.3 (2005) (noting that the Department’s objection rate has “been falling steadily” ever since the early years of the YRA and equaled 0.05% between 1998 and 2002). In the vast majority of cases, then, the overall effect of § 5 is merely to delay implementation of a perfectly proper law.
Of course the most critical features of § 5 are the substantive standards it applies to the covered jurisdictions. Whether a proposed voting change can be precleared turns on whether it would have a retrogressive effect on minority voters. See Beer v. United States, 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). In practice this standard requires a jurisdiction not only to engage in some level of race-conscious decisionmaking, but also on occasion to sacrifice principles aimed at depoliticizing redistricting. Suppose a covered jurisdiction sought to implement what we may loosely call “good government” principles. It might, for example, delegate the task of redistricting to a computer programmed to apply criteria such as compactness, contiguity, conformity to existing political boundaries, and satisfaction of one person, one vote requirements. Despite these worthy goals, the resulting plan, if it happened to reduce the number of majority-minority districts, would fail preclearance, as the government acknowledged at oral argument. See Tr. of Oral Arg. at 37-38. As Justice Kennedy cautioned in Georgia v. Ashcroft, 539 U.S. 461, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003), “[Considerations of race that would doom a redistricting plan under the Fourteenth Amendment ... seem to be what save it under § 5.” Id. at 491, 123 S.Ct. 2498 (Kennedy, J., concurring); see also Miller v. Johnson, 515 U.S. 900, 927, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (noting that Justice Department’s “implicit command that States engage in presumptively unconstitutional race-based districting brings the Act ... into tension with the Fourteenth Amendment”).
Unfortunately, when Congress passed the 2006 version of the VRA, it not only disregarded but flouted Justice Kennedy’s concern. New subsections (b) and (d) were added to § 5 to overturn Georgia v. Ashcroft, thereby restricting the flexibility of states to experiment with different methods of maintaining (and perhaps even expanding) minority influence. The Georgia Court had prescribed a holistic approach to § 5, instructing courts confronting a proposed voting change “not [to] focus solely on the comparative ability of a minority group to elect a candidate of its choice,”[2] 539 U.S. at 480, 123 S.Ct. 2498 *887 (majority opinion), but also to consider the “extent to which a new plan changes the minority group’s opportunity to participate in the political process” writ large, id. at 482, 123 S.Ct. 2498. Georgia thus gave covered jurisdictions an opportunity to make trade-offs between concentrating minority voters in increasingly safe districts and spreading some of those voters out into additional districts; the latter choice, the Court pointed out, might increase the “substantive representation” they enjoy and lessen the risks of “isolating minority voters from the rest of the State” and of “narrowing [their] political influence to only a fraction of political districts.” Id. at 481, 93 S.Ct. 1702; see also Samuel Issacharoff, Is Section 5 of the Voting Rights Act a Victim of Its Own Success?, 104 Colum. L.Rev. 1710, 1729 (2004) (expressing concern that § 5’s “narrow focus on securing the electability of minority candidates could compromise the range of political accords available to minority voters and thereby, under conditions of mature political engagement, actually thwart minority political gains”); David Epstein & Sharyn O’Halloran, Measuring the Electoral and Policy Impact of Majority-Minority Voting Districts, 43 Am. J. Pol. Sci. 367, 390-92 (1999) (noting that overreliance on majority-minority districts means that “moderate senators will likely be replaced by extremists,” undermining the ability to create “biraeial coalitions [which] are a key to passing racially progressive policies”). In so doing, the Court recognized that a minority group might in fact “achieve greater overall representation ... by increasing the number of representatives sympathetic to the interests of minority voters,” rather than merely by electing the maximum possible number of representatives dependent on securing a majority of minority votes. 539 U.S. at 483, 123 S.Ct. 2498.
As amended, the act forecloses this choice. Preclearance now has an exclusive focus — whether the plan diminishes the ability of minorities (always assumed to be a monolith) to “elect their preferred candidates of choice,” irrespective of whether policymakers (including minority ones) decide that a group’s long-term interests might be better served by less concentration — and thus less of the political isolation that concentration spawns. See 42 U.S.C. § 1973c(b); id. § 1973e(d); see also Texas v. United States, 831 F.Supp.2d 244, at 250-51, 2011 WL 6440006, at *4 (D.D.C. Dec. 22, 2011) (interpreting the amended law to overturn Georgia). The amended § 5 thus not only mandates race-conscious decisionmaking, but a particular brand of it. In doing so, the new § 5 aggravates both the federal-state tension with which Northwest Austin was concerned and the tension between § 5 and the Reconstruction Amendments’ commitment to nondiscrimination.
Another 2006 amendment makes the § 5 burden even heavier. Section 5 prohibits preclearance of laws that have the “purpose” of “denying or abridging the right to vote on account of race or color.” 42 U.S.C. § 1973c(a). The Court had interpreted “purpose” to be consistent with § 5’s effects prong, so that the term justified denying preclearance only to changes with a “retrogressive” purpose, rather than changes with either that or a discriminatory purpose. See Reno v. Bossier Parish School Bd., 528 U.S. 320, 341, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000) (“Bossier II ”). The 2006 amendments reversed that decision, specifying that “purpose” encompassed “any discriminatory purpose.” 42 U.S.C. § 1973c(c) (emphasis added). This broadening of the § 5 criteria may seem unexceptionable, but the Court had previously found that assigning covered jurisdictions the burden of proving the absence *888 of discriminatory purpose was precisely the device that the Department had employed in its pursuit of maximizing majority-minority districts at any cost: “The key to the Government’s position, which is plain from its objection letters if not from its briefs to this court ..., is and always has been that Georgia failed to proffer a nondiscriminatory purpose for its refusal in the first two submissions to take the steps necessary to create [an additional] majority-minority district.” Miller, 515 U.S. at 924, 115 S.Ct. 2475. By inserting discriminatory purpose into § 5, and requiring covered jurisdictions affirmatively to prove its absence, Congress appears to have, at worst, restored “the Justice Department’s implicit command that States engage in presumptively unconstitutional race-based districting,” id. at 927, 115 S.Ct. 2475, and at best, “exacerbate[d] the substantial federalism costs that the preclearance procedure already exacts,” Bossier II, 528 U.S. at 336, 120 S.Ct. 866.
The majority correctly notes that Shelby did not argue that either of these amendments is unconstitutional. See Maj. Op. at 883. Neither do I. Appellant does argue however that § 4(b) is unconstitutional, that is, that § 4(b) is not a congruent and proportional response to the problem currently posed by voting discrimination. To answer that question one must necessarily first assess the severity of the consequences of coverage under § 4(b) (i.e., subjection to § 5 as it exists today). See supra at p. 885.
Whether Congress is free to impose § 5 on a select set of jurisdictions also depends in part, of course, on possible shortcomings in the remedy that § 2 provides for the country as a whole. That section creates a right to sue any jurisdiction to stop voting practices that “result[] in a denial or abridgement” of the right to vote “on account of race or color.” 42 U.S.C. § 1973(a). Doubtless the section is less drastic a remedy than § 5 (and thus by some criteria less effective). But it is easy to overstate the inadequacies of § 2, such as cost and the consequences of delay. Compare Maj. Op. at 872. Unlike in most litigation, plaintiffs’ costs for § 2 suits can in effect be assumed by the Department of Justice by its either exercising its authority to bring suit itself, see, e.g., United States v. Blaine County, 363 F.3d 897 (9th Cir.2004), or by intervening in support of the plaintiff, as it often does. See, e.g., Brown v. Bd. of School Comm’rs, 706 F.2d 1103, 1107 (11th Cir.1983). So far as Departmental resource constraints are concerned, narrowing § 5’s reach would, as a matter of simple arithmetic, enable it to increase § 2 enforcement with whatever resources it stopped spending on § 5. For those cases where the Justice Department still fails to intervene, § 2 provides for reimbursement of attorney and expert fees for prevailing parties. See 42 U.S.C. § 19731(e). Finally, as to the risk that discriminatory practices may take hold before traditional litigation has run its course, courts may as always use the standard remedy of a preliminary injunction to prevent irreparable harm caused by adjudicative delay. See Perry v. Perez, — U.S. -, 132 S.Ct. 934, 942, 181 L.Ed.2d 900 (2012).
Indeed, the ubiquitous availability of § 2 is of course a reminder that § 5 was created for the specific purpose of overcoming state and local resistance to federal anti-discrimination policy. When the Supreme Court first upheld the act in 1966, it found that § 5 was necessary because “case-by-case litigation,” now governed by § 2, was “inadequate to combat the widespread and persistent discrimination in voting.” Katzenbach, 383 U.S. at 328, 86 S.Ct. 803. While § 2 was tailored to redress actual instances of discrimination, § 5 was crafted to overcome a “century of systematic *889 resistance to the Fifteenth Amendment” and ongoing “obstructionist tactics.” Id.
But life in the covered jurisdictions has not congealed in the 48 years since the first triggering election (or the 40 years since the most recent). “[Cjurrent burdens ... must be justified by current needs,” Northwest Austin, 129 S.Ct. at 2512, and the burden imposed by § 5 has only grown heavier in those same years.
In order for § 4(b) to be congruent and proportional then, the disparity in current evidence of discrimination between the covered and uncovered jurisdictions must be proportionate to the severe differential in treatment imposed by § 5. Put another way, a distinct gap must exist between the current levels of discrimination in the covered and uncovered jurisdictions in order to justify subjecting the former group to § 5’s harsh remedy, even if one might find § 5 appropriate for a subset of that group.
I now turn to assessing the evidence used to justify the § 4(b) coverage formula. The parties have offered no sophisticated statistical analysis of voting discrimination in the covered and uncovered jurisdictions, and what follows does not purport to fill the sophistication gap.
The data considered are drawn from the evidence the parties have cited, as well as the more general set compiled by Congress, especially data the Supreme Court has previously found important. For instance, when it upheld the preclearance regime in 1980, the Supreme Court noted both the “significant disparity” that still existed between African-American and white voter registration rates, and the fact that the number of black elected officials in covered jurisdictions “fell far short of being representative” of the number of African-Americans residing in covered jurisdictions. City of Rome v. United States, 446 U.S. 156, 180-81, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). Beyond voter registration and black elected officials, the parties point us to comparative, state-by-state data detailing the number of federal observers sent into states to oversee elections, plus the number of successful § 2 lawsuits. I take each of these in turn.

Voter Registration and Turnout

Section 4(b)’s coverage formula is keyed to two indicators of voter access: voter turnout and the use of tests and devices in voter registration. See 42 U.S.C. § 1973b(b). In 1966 the Supreme Court characterized the VRA as “specifically designed” to remedy the “misuse of tests and devices” that characterized the “widespread and persistent discrimination” at the time. Katzenbach, 383 U.S. at 331, 86 S.Ct. 803. Section 5 was thus meant, at the very least, to ensure that members of minority groups had equal access to the voting booth.
Figures I and II[3] focus on this central problem. The two charts compare white and black registration and turnout rates in the 2004 election, using state-by-state estimates from the U.S. Census Bureau. See U.S. Census Bureau, Reported Voting and Registration of the Total Voting-Age Population, at tbl.4a, available at http://www. census.gov/hhes/www/socdemo/voting/ publications/p20/2004/tables.html. Each chart takes the number of non-Hispanic whites who registered or turned out as a proportion of the total citizen voting-age population (“CVAP”) and compares that ratio to the same ratio for the black population, i.e., it displays the ratio of these two ratios for each state. Thus the greater the ratio (and the further to the left on the *890 chart), the greater the racial disparity. The chart excludes states where the Census Bureau was unable to make reliable estimates of black registration and turnout rates (presumably because the black population was too small to get a sufficient sample).[4]
[[Image here]]
*891 [[Image here]]
There appears to be no positive correlation between inclusion in § 4(b)’s coverage formula and low black registration or turnout. Quite the opposite. To the extent that any correlation exists, it appears to be negative — condemnation under § 4(b) is a marker of higher black registration and turnout. Most of the worst offenders— states where in 2004 whites turned out or were registered in significantly higher proportion than African-Americans — are not covered. These include, for example, the three worst — Massachusetts, Washington, and Colorado. And in Alabama and Mississippi, often thought of as two of the worst offenders, African-Amencans turned out in greater proportion than whites.

Black Elected Officials

The other metric that the Rome Court considered was the number of black elected officials. Figure III uses U.S. Census Bureau data from 2000 and a state-by-state breakdown of such officials from that same year and displays the number of African-Americans who had been elected to office as a proportion of their share of the total CVAP in a given state. See David A Bostis, Joint Ctr. for Pol. & Econ. Studies, Black Elected Officials: A Statis *892 tical Summary 2000, available at http:// www.jointcenter.org/research/blackelected-offieials-a-statistical-summary2000; U.S. Census Bureau, Voting-Age Population and Voting-Age Citizens, at tbls.1-1 & 1-3, available at http://www. census.gov/population/www/cen2000/briefs/ phc-t31/index.html. Thus, the higher the percentage (and accordingly the further to the right on the chart), the closer African-Americans’ share of elected positions is to equaling their share of the CVAP. States where the African-American share of CVAP was less than 3% are excluded.
[[Image here]]
Again the results are the inverse of § 4(b)’s presuppositions. Covered jurisdictions have far more black officeholders as a proportion of the black population than do uncovered ones. Of the ten states with the highest proportion of black elected officials relative to population, eight are covered states, with the top five all being fully covered states (Virginia, Louisiana, South Carolina, Mississippi, and Alabama). Nor can the poor scores achieved by some uncovered states be chalked up to small black populations. Illinois, Missouri, Delaware and Michigan, where African-Ameri *893 cans comprise at least 10% of the CVAP, all fall to the left (i.e., on the worse side) of every one of the states fully covered by § 4(b). While the relatively high number of black officeholders in covered states might be taken as a testament to § 5’s past success, no one could credibly argue that the numbers are proof of the coverage scheme’s continued rationality.
In upholding § 5, the district court acknowledged that the number of black elected officials had increased but found the nature of the positions insufficient, pointing particularly to the nationwide disparity between the black proportion of the population (11.9%) and the number of black officials elected to statewide office (5%). Shelby County v. Holder, 811 F.Supp.2d 424, 468-69 (D.D.C.2011). It is unclear how this supports singling out the covered jurisdictions. Of the 35 black officials holding statewide elective office in the whole country in 2000 (including 2 from the U.S. Virgin Islands), nearly a third (11) came from fully covered states, Bostis, supra, at 24 tbl.7A, a proportion roughly equivalent to these jurisdictions’ share of the nation’s African-American citizen voting-age population (about 33%), see U.S. Census Bureau, Voting-Age Population and Voting-Age Citizens, supra, at tbl.1-3. Of course one might expect that the higher average African-American share of the population in the covered states would lead to a higher share of statewide elected officials. But if on that account one thinks there has been a shortfall in the covered states, it might be caused in part by the Justice Department’s policy of maximizing majority-minority districts, with the concomitant risks of “isolating minority voters from the rest of the State” and “narrowing [their] political influence to only a fraction of political districts.” Georgia v. Ashcroft, 539 U.S. 461, 481, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003). If African-American candidates primarily face solidly African-American constituencies, and thus develop political personas pitched overwhelmingly to the Democratic side of the aisle, it would hardly be surprising that they might face special obstacles seeking statewide office (assuming, of course, racially-polarized voting, as § 5 does). See Epstein, supra, at 390-92.

Federal Observers

Section 8 of the VRA authorizes the Department to send federal observers to covered jurisdictions in order to enter polling places and monitor elections if “necessary to enforce the guarantees of the 14th or 15th amendment.” 42 U.S.C. § 1973f(a)(2)(B). Additionally, § 3(a) permits a court to authorize the appointment of federal observers in any political subdivision, whether covered or uncovered, if the court finds it “appropriate to enforce the voting guarantees of the fourteenth or fifteenth amendment.” Id. § 1973a(a); see also id. § 1973f(a)(l). In an extensive report, the National Commission on the Voting Rights Act mapped the number of occasions these observers had been assigned to states in the 22-year period between the prior VRA authorization (1982) and the 2004 election. See Nat’l Comm’n on the Voting Rights Act, Protecting Minority Voters: The Voting Rights Act at Work 1982-2005, at 61 & Map 10B (Feb. 2006) (“Nat’l Comm’n Report”). Figure IV shows the state-by-state distribution of observer coverages per million minority residents, where the minority population is calculated by subtracting the non-Hispanic white population from the total 2004 population, as estimated by the U.S. Census Bureau. See U.S. Census Bureau, Annual Estimates of the Population for Race Alone and Hispanic or Latino Origin for the United States and States: July 1, 2004, available at http://www.census.gov/popest/ data/historical/2000s/vintage_2004/state. html.
*894 Superficially, Figure IV supports § 4(b), indicating that observers are being sent to covered states more often than to uncovered ones. Six of the “worst” eight states are covered ones. But a number of factors undermine any serious inference. First, the National Commission report explains that it has captured “each occasion when federal observers are detailed to a jurisdiction covered by Section 5 or Section 203.” Nat’l Comm’n Report at 60 (emphasis added). The apparent implication is that the Commission didn’t purport to collect data for jurisdictions not covered by either of those sections; if so, the data are useless for comparative purposes. Indeed, testimony before Congress suggests that the Civil Rights Division simply doesn’t use “observers” for uncovered states, preferring instead to send its own staff lawyers to monitor elections “[i]n areas of the country where Federal observers cannot be sent” (presumably meaning, “cannot be sent without the necessity and deterrent of getting court approval”). Voting Rights Act: Sections 6 and 8 — The Federal Examiner and Observer Program: Hearing Before the Subcomm. on the Constitution of the Comm, on the Judiciary, 109th Cong. 196 (2005) (statement of Bernard Schlozman). In fact, when calling this to Congress’s attention, a Department official noted that the “the great bulk of ... recent enforcement cases since, say 1993, have involved jurisdictions (e.g., Massachusetts, California, New York, New Jersey, Florida, Washington, and Pennsylvania) where there is no statutory authority to send Federal observers.” Id.
*895 [[Image here]]
Even if we were to assume the National Commission’s figures to be complete, and thus that every federal observer between 1982 and 2004 was sent to a jurisdiction already covered under some part of the VRA (either § 5 or § 203), this suggests another limitation on the data’s relevance: The same Department that administers § 5 preclearance also decides where to send observers, so it is unsurprising that the covered states, which are already in the Department’s sights, would also receive the most observers. Finally, § 3 forces the Justice Department to go to court for authorization to assign observers to uncovered areas, while § 8 imposes no such hurdle for the covered ones, undermining further the data’s already questionable value.

Successful Section 2 Lawsuits

The final metric for which comparative data exist is reported, successful § 2 lawsuits. Appellees point us to a comprehensive list of reported, post>-1982 § 2 cases compiled by Professor Ellen Katz and the Voting Rights Initiative at the University of Michigan Law School. See Ellen Katz & The Voting Rights Initiative, VRI Data *896 base Master List (2006) (“Katz Master List”), available at http://sitemaker.umich. edu/votingrights/files/masterlist.xls. Relying on these data, the district court noted that more than 56% of successful § 2 suits from 1982 to 2006 have been filed in covered jurisdictions, although those jurisdictions comprise only a quarter of the nation’s population. See Shelby County, 811 F.Supp.2d at 506.
But the persuasive power of this statistic dissolves when we disaggregate the data by state. Figure V looks at each state’s number of successful § 2 lawsuits between 1982 and 2005, per million residents, using the same 2004 U.S. Census Bureau population estimates used above. Because Professor Katz’s database helpfully informs us whether each lawsuit was located in a covered or uncovered jurisdiction, it is possible to break out the covered portions of partially covered states from the uncovered portions:[5] A “(C)” below the state’s abbreviation indicates that the data pertain only to the covered portion of that state, and an “(NC)” indicates the opposite. Because one successful case in a covered portion of South Dakota in 24 years produced a ratio of 43 cases for every hypothetical million residents, the covered portions of South Dakota are excluded in order to avoid distorting the chart’s scale.
*897 [[Image here]]
Like the federal observer data discüssed above, Figure V suggests that a more narrowly tailored coverage formula — capturing only Mississippi, Alabama, and Louisiana, and possibly the covered portions of South Dakota and North Carolina — might be defensible. But beyond these, the covered jurisdictions appear indistinguishable from their uncovered peers. The five worst uncovered jurisdictions, including at least two quite populous states (Illinois and Arkansas), have worse records than eight of the covered jurisdictions: the six covered states appearing to the right, plus two fully covered states — Arizona and Alaska — which do not appear on the chart at all because there has been not one successful § 2 suit in those states in the whole 24-year period. Of the ten jurisdictions with the greatest number of successful § 2 lawsuits, only four are covered (five if we add back in the covered portion of South Dakota). A formula with an error rate of 50% or more does not seem “congruent and proportional.”
To bolster these numbers, the majority relies on an account of purportedly successful, but unreported § 2 cases, numbers *898 that it rightly notes one should “approach ... with caution.” Maj. Op. at 877. Indeed, beyond the serious concerns about these data already elucidated by the majority (e.g., completely different groups gathered the data regarding covered and uncovered jurisdictions), we also have almost no information for how Mr. McCrary and his staff identified particular cases as “successful” or not. All we know is that he required “some evidence” that the case was “resolved” under § 2 and “some reference” to settlement. Joint Appendix 95. And the inference of “success” from evidence of possible settlements seems exceptionally weak, for both the unreported cases in the covered jurisdictions compiled by the National Commission and those from the uncovered jurisdictions compiled by Mr. McCrary. It overlooks not only the range of outcomes embraced in the concept of settlement but also the strategic factors, including legal fees and reputational risk, that go into a jurisdiction’s decision to settle.
Additionally, defenders of the coverage scheme point to two circumstances that might also artificially reduce § 2 figures for the covered states, namely the “blocking” effect of actual § 5 vetoes, and the deterrent effect of jurisdictions’ having to seek preclearance. As to blocking, there seems little basis to infer that many of the 626 objections spread over 24 years were substitutes for successful § 2 suits. Any such inference is undermined by the Department’s ability to almost costlessly “Just Say No,” the allocation of the burden of proof to the jurisdiction, the legal fees that fighting the Department will entail, and the difference in the substantive standards governing § 2 and § 5 proceedings.
As to the imputed deterrence, it is plainly unquantifiable. If we assume that it has played a role, how much should we inflate the covered states’ figures to account for it, and which covered states? Given much weight, the supposed deterrent effect would justify continued VRA renewals out to the crack of doom. Indeed, Northwest Austin’s insistence that “current burdens ... must be justified by current needs,” 129 S.Ct. at 2512, would mean little if § 5’s supposed deterrent effect were enough to justify the current scheme. See Tr. of Oral Arg. at 28, Northwest Austin Municipal Utility Dist. No. One v. Holder, 557 U.S. 193, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009) (No. 08-322) (statement of Chief Justice Roberts) (“Well, that’s like the old — you know, it’s the elephant whistle. You know, I have this whistle to keep away the elephants____Well, there are no elephants, so it must work.”).
To recap, of the four metrics for which comparative data exist, one (voter registration and turnout) suggests that the coverage formula completely lacks any rational connection to current levels of voter discrimination, another (black elected officials), at best does nothing to combat that suspicion, and, at worst, confirms it, and two final metrics (federal observers and § 2 suits) indicate that the formula, though not completely perverse, is a remarkably bad fit with Congress’s concerns. Given the drastic remedy imposed on covered jurisdictions by § 5, as described above, I do not believe that such equivocal evidence can sustain the scheme.
The Supreme Court’s initial review of the formula in 1966 provides a model for evaluating such an imperfect correlation. It assessed the evidence of discrimination before it and divided the covered jurisdictions into three categories: (1) a group for which “federal courts have repeatedly found substantial voting discrimination”; (2) another group “for which there was more fragmentary evidence of recent voting discrimination”; and (3) a third set consisting of the “few remaining States *899 and political subdivisions covered by the formula,” for which there was little or no such evidence of discrimination, but whose use of voting tests and low voter turnout warranted inclusion, “at least in the absence of proof that they have been free of substantial voting discrimination in recent years.” Katzenbach, 383 U.S. at 329-30, 86 S.Ct. 803. In that original review, the Supreme Court placed three states (Alabama, Mississippi, and Louisiana) in category one, another three (Georgia, South Carolina, and the covered portions of North Carolina) in category two, and finally two fully covered states (Virginia and Alaska) plus a few counties in Hawaii, Idaho, and Arizona, in category three.
The evidence adduced above yields a far worse fit than the data reviewed in Katzenbach. Indeed, one would be hard-pressed to put any of the covered jurisdictions into Katzenbach’s first category. Based on any of the comparative data available to us, and particularly those metrics relied on in Rome, it can hardly be argued that there is evidence of a “substantial” amount of voting discrimination in any of the covered states, and certainly not at levels anywhere comparable to those the Court faced in Katzenbach. In terms of successful § 2 law suits, only three covered states — Mississippi, Louisiana, and Alabama — plus uncovered Montana — have more than two successful suits per million residents over the past quarter-century (excluding of course the covered portion of South Dakota, which scores high only because with such a small population the one suit there produces a high ratio per hypothetical million); in fact, these three states are the only ones with more than 10 successful suits in the 24 years between 1982 and 2006.[6] See Katz Master List. And of course, even this number may be artificially large since a successful § 2 suit does not necessarily entail a finding of unconstitutional behavior (i.e., intentionally discriminatory acts); indeed, the Katz Study itself reports only 12 findings of intentional discrimination in the covered jurisdictions over the same two-and-a-half decades, and on my reading of the cases Professor Katz lists, there are even fewer. See, e.g., Brown v. Bd. of School Comm’rs, 706 F.2d 1103, 1107 (11th Cir.1983) (listed in both the Senate and Katz reports as a case finding discriminatory intent, but the case finds such intent only as to an electoral system enacted in 1876).
Even assuming that these small numbers would qualify as “fragmentary evidence” adequate to place those three in Katzenbach’s second category, that leaves six fully covered states (plus several jurisdictions in partially covered states) in category three, many more than in 1966, when only two fully covered states (Virginia and Alaska) were not included in either category one or two. See Katzenbach, 383 U.S. at 318, 329-30, 86 S.Ct. 803. A coverage scheme that allows two or three of the worst offenders to drag down other covered jurisdictions, whose continued inclusion is merely a combination of historical artifact and Congress’s disinclination to update the formula, can hardly be thought “congruent and proportional.” See Nathaniel Persily, The Promise and Pitfalls of the New Voting Rights Act, 117 Yale L.J. 174, 208-09 (2007) (concluding that any “debate over the coverage formula” would “likely have led to the complete unraveling” of the VRA’s 2006 reauthorization campaign); id. at 208 (“The most one can say in defense of the formula is that it is the best of the politically feasible alternatives .... ”). Congress’s inability to agree on a currently coherent formula is *900 not a good reason for upholding its extension of an anachronism.
Moreover, the Court in 1966 relied on rather a natural inference from the data available. The tight relationship between the two trigger criteria (i.e., voter turnout and the use of voting “tests and devices”) and evidence of discrimination in the states in categories one and two, made it logical to suppose that Congress reasonably inferred a comparable fit for the remaining covered jurisdictions for which direct evidence of discrimination was missing (i.e., those in category three). But today the trigger criteria have lost any inherent link to the key concern. The newest triggering data hark back to 1972, 34 years before the current formula was enacted, and nearly 60 years before the current act expires. Indeed, if the formula were to be updated to use more recent election data, it would cover only Hawaii. See 152 Cong. Rec. H5131, H5181 (daily ed. July 13, 2006).
More critically, the Court’s acceptance of the § 4(b) formula in 1966 was explicitly based on certain reasonable understandings of § 5’s focus. Explaining why it saw no serious problem in the challengers’ claim of underinclusiveness— § 4(b)’s exclusion of localities not employing “tests or devices” but showing evidence of voting discrimination by other means — the Court observed that Congress had learned that persistent discrimination “has typically entailed the misuse of tests and devices, and this was the evil for which the new remedies were specifically designed.” Katzenbach, 383 U.S. at 331, 86 S.Ct. 803 (emphasis added). Despite § 5’s language imposing preclearance on all manner of voting rules not within the act’s definition of “tests or devices,” the Court understandably saw the act as focused on, or in its words “specifically designed” for, rooting out “the misuse of tests and devices.” But § 5 litigation no longer centers at all on “tests and devices.” Instead, the majority of § 5 objections today concern redistricting. See Peyton McCrary et al., The Law of Preclearance: Enforcing Section 5, in The Future of the Voting Rights Act 20, 25 tbl.2.1 (David Epstein et al. eds., 2006) (redistricting objections comprised only 17% of Justice Department objections in the 1970s; in the '90s, they constituted 52% of all objections). Accordingly, quite apart from the trigger criteria’s hopeless fossilization, the intrinsic link between them and their consequences has ceased to exist.
Nor is the coverage formula materially helped by the VRA’s bailout provision. Although Katzenbach did note that § 4(a)’s bailout provision might alleviate concerns about overinclusiveness, see 383 U.S. at 331, 86 S.Ct. 803, its ability to act as a reliable escape hatch is questionable. In its original form, § 4(a) essentially permitted bailout for any jurisdiction that had not used a voting “test or device” in the previous five years. See Voting Rights Act of 1965, Pub.L. 89-110, § 4(a), 79 Stat. 437, 438. This in effect excluded any covered jurisdiction whose record was not clean as of the date of initial enactment, and until 1982 the later reenactments’ language continued that effect (i.e., allowed access to bailout only for those jurisdictions with clean records as of the VRA’s initial adoption). While the majority correctly notes that the 1982 amendments relaxed that constraint, see Maj. Op. at 855-56, those same amendments tightened the remaining substantive standards. A covered jurisdiction can now obtain bailout if, and only if, it can demonstrate that, during the preceding ten years, it has (simplifying slightly): (1) effectively engaged in no voting discrimination (proven by the absence of any judicial finding of discrimination or even a Justice Department “objection” (unless judicially overturned)); (2) faithfully complied with § 5 *901 preclearance; (3) “eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process”; and (4) engaged in “constructive efforts to eliminate intimidation and harassment of persons exercising rights protected” under the act and “in other constructive efforts, such as the expanded opportunity for convenient registration.” 42 U.S.C. § 1973b(a)(l). Perhaps because of these opaque standards, actual bailouts have been rare; only 136 of the more than 12,000 covered political subdivisions (i.e., about 1%) have applied for bailout (all successfully). Appellant’s Reply Br. 37; Voting Section, U.S. Dep’t of Justice, Terminating Coverage Under the Act’s Special Provisions, http://www.justice.gov/crt/ about/vot/misc/sec_4.php# bailout (last visited May 9, 2012) (listing successful bailouts). Moreover, a successful action under § 4(a) does not actually end federal oversight of bailed-out jurisdictions; for a decade after bailout, the court “retain[s] jurisdiction” just in case the Justice Department or “any aggrieved person” wishes to file a motion “alleging that conduct has occurred which ... would have precluded” bailout in the first place. 42 U.S.C. § 1973b(a)(5).
All of this suggests that bailout may be only the most modest palliative to § 5’s burdens. One scholar hypothesizes that bailout may “exist[] more as a fictitious way out of coverage than [as] an authentic way of shoring up the constitutionality of the coverage formula.” Persily, supra, at 213. In fairness, the same scholar also entertains various other explanations, including the possibility that the eligible jurisdictions are just the ones for whom § 5 poses only a very light burden, see id. at 213-14, and ultimately concludes that no one knows which theory “best explains the relative absence of bailouts,” id. at 214. Regardless of the reason for the trivial number of bailouts, irrational rules — here made so by their encompassing six states and numerous additional jurisdictions not seriously different from the uncovered states — cannot be saved “by tacking on a waiver procedure” such as bailout. ALLTEL Corp. v. FCC, 838 F.2d 551, 561 (D.C.Cir.1988); cf. U.S. Telecomm. Ass’n v. FCC, 359 F.3d 554, 571 (D.C.Cir.2004).
Finally the government argues that because the VRA is meant to protect the fundamental right of racial minorities (i.e., a suspect classification), a heightened level of deference to Congress is in order. Appellees’ Br. 22-23. Purportedly supporting this proposition is Chief Justice Rehnquist’s statement in Nevada Dep’t of Human Resources v. Hibbs, 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003), that when a statute is designed to protect a fundamental right or to prevent discrimination based on a suspect classification, “it [is] easier for Congress to show a pattern of state constitutional violations.” Id. at 736, 123 S.Ct. 1972. But the passage simply makes the point that where a classification is presumptively invalid (e.g., race), an inference of unlawful discrimination follows almost automatically from rules or acts that differentiate on the presumptively forbidden basis, whereas for classifications judged under the “rational basis” test, such as disability or age, “Congress must identify, not just the existence of age- or disability-based state decisions, but a widespread pattern of irrational reliance on such criteria.” Id. at 735, 123 S.Ct. 1972 (emphasis added). This special element of race or other presumptively unconstitutional classifications has no bearing on review of whether Congress’s remedy “fits” the proven pattern of discrimination. To hold otherwise would ignore completely the “vital principles necessary to maintain separation of powers and the federal balance” that the Court held paramount in Boeme (which of course also involved a fundamental right, namely the right to practice one’s reli *902 gion). City of Boerne v. Flores, 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).
* * *
A current political dispute — state adoptions of voter identification requirements— highlights the oddity of § 4(b). In 2005, the state of Indiana enacted a law requiring its citizens to present a government-issued photo identification before voting. Against a variety of legal challenges, the Supreme Court upheld the law. See Crawford v. Marion County Election Bd., 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008). In 2011, Texas and South Carolina both passed similar laws. See Gina Smith, Haley Signs Voter ID Bill into Law, The State, May 18, 2011; Sommer Ingram, Gov. Rick Perry Signs Voter ID Bill into Law, Assoc. Press, May 27, 2011, available at http://www.yumasun. com/articles/perry-51036-monitortx-rickaustin.html. But because of those states’ inclusion under § 4(b), they had to look to Justice Department attorneys in Washington to seek further approval. In the end, the Department blocked both laws. See Jerry Markon, S.C. ’s Voter ID Law Rejected, Wash. Post, Dec. 24, 2011, at A4; Daniel Gilbert, Election 2012: Terns Law Requiring Voter IDs Is Blocked, Wall St. J., Mar. 13, 2012, at A4.
Why should voter ID laws from South Carolina and Texas be judged by different criteria (at a minimum, a different burden of persuasion, which is often critical in cases involving competing predictions of effect) from those governing Indiana? A glimpse at the charts shows that Indiana ranks “worse” than South Carolina and Texas in registration and voting rates, as well as in black elected officials (Figures I, II and III). As to federal observers, Indiana appears clearly “better” — it received none (Figure IV). As to successful § 2 suits South Carolina and Texas are “worse” than Indiana, but all three are below the top ten offenders, which include five uncovered states (Figure V). This distinction in evaluating the different states’ policies is rational?
Despite a congressional record of over 15,000 pages and 22 hearings, Shelby County, 811 F.Supp.2d at 496, there is little to suggest that § 4(b)’s coverage formula continues to capture jurisdictions with especially high levels of voter discrimination. To the extent that the answer is, as the district court suggested, that Congress wished to “continue to focus on those jurisdictions with the worst historical records of voting discrimination,” id. at 506, such an overwhelming focus on historical practices appears foreclosed by Northwest Austin’s requirement that current burdens be justified by current needs.
It goes without saying that racism persists, as evidenced by the odious examples offered by the majority, see Maj. Op. at 865-66. But without more evidence distinguishing current conditions in the covered jurisdictions from those in the uncovered ones, § 4(b)’s coverage formula appears to be as obsolete in practice as one would expect, in a dynamic society, for markers 34-to-59 years old. Accordingly, I dissent.
The analysis above is my sole basis for finding § 4(b) of the VRA unconstitutional and thus for dissenting from the court’s opinion. I need not and do not reach the constitutionality of § 5 itself. But before concluding, I want to address a critical aspect of § 5, and of some of the cases interpreting earlier versions of that section. I address it first simply as a matter of language' — specifically the use of language to obscure reality — and then in relation to the words and political philosophy of the 15th Amendment. Though unnecessary to my dissent’s outcome, the troubling tension between the act’s encouragement *903 of racial gerrymandering and the ideals embodied in the 15th Amendment seems worthy of attention.
Section 5(b) makes unlawful any voting practice or procedure with respect to voting “that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color ... to elect their preferred candidates of choice.” 42 U.S.C. § 1973c(b) (emphasis added). And of course similar phrasing has been included in § 2 since 1982. See Voting Rights Act Amendments of 1982, Pub.L. No. 97-205, § 3, 96 Stat. 131,134 (codified at 42 U.S.C. § 1973(b)) (prohibiting policies that prevent minority groups’ equal opportunity “to elect representatives of their choice.”).
The language (or a close equivalent) seems to have originated in one of the Court’s earliest opinions on § 5, though only as an offhand phrase in its explanation of how a shift from district to at-large voting might dilute minority impact: “Voters who are members of a racial minority might well be in the majority in one district, but a decided minority in the county as a whole. This type of change could therefore nullify their ability to elect the candidate of their choice.” Allen v. State Bd. of Elections, 393 U.S. 544, 569, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). But the use of such language became troubling in Georgia v. Ashcroft, where the Court said that in the application of § 5 “a court should not focus solely on the comparative ability of a minority group to elect a candidate of its choice.” 539 U.S. 461, 480, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003) (emphasis added). The “solely” of course indicates approval of such a consideration as one among several criteria for compliance with § 5.
Implied from the statutory “their” is necessarily a “they.” In the context of a statute speaking of impingements on citizens’ voting “on account of race or color,” and indeed in the universally accepted understanding of the provision, the “they” are necessarily members of minority groups. But in what sense do minority groups as such have a “preferred candidate”? Individuals, of course, have preferred candidates, but groups (unless literally monolithic) can do so only in the limited sense that a majority of the group may have a preferred candidate. Thus, when the provision is translated into operational English, it calls for assuring “the ability of a minority group’s majority to elect their preferred candidates.”
This raises the question of what happened to the minority group’s oum minority — those who dissent from the preferences of the minority’s majority?
Of course in any polity that features majority rule, some people are bound to be outvoted on an issue or a candidate and thus to “lose” — on that round of the ongoing political game. Such losses are a necessary function of any system requiring less than unanimity (which would be hopelessly impractical). And in an open society that allows people freely to form associations, and to design those associations, some people obviously will be members of associations whose representatives from time to time express, in their name, opinions they do not share. But that again is a necessary function of having associations free to adopt a structure that empowers their leadership to speak with less than unanimous backing.
But the implied “they” of § 5 is not a polity in itself; nor is it an association freely created by free citizens. Quite the reverse: It is a group constructed artificially by the mandate of Congress, entirely on the lines of race or ethnicity.
On what authority has Congress constructed such groups? Purportedly the 15th Amendment to the Constitution. But that says that the “right of citizens of the *904 United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.”
It is hard to imagine language that could more clearly invoke universal individual rights. It is “citizens” who are protected, and they are protected from any denial of their rights that might be based on the specified group characteristics — race, col- or, or previous condition of servitude. The members of Congress who launched the amendment, said Senator Willard Warner, “profess to give to each individual an equal share of political power.” Cong. Globe, 40th Cong., 3d Sess. 861 (1869).
The 15th Amendment was a pivot point in the struggle for universal human rights. The roots of the struggle are deep and obscure. Many trace the concept to the three great monotheistic religions, Judaism, Christianity, and Islam. See, e.g., Micheline R. Ishay, The History op Human Rights (2004) (noting the contributions of these three traditions, among others). No matter how spotty the actual performance of those religions’ adherents may have been over the centuries, the idea of a single God, claiming the allegiance of all mankind, surely implies a recognition of the dignity and worth of all humans, undistorted by local group loyalties historically linked to local gods. Perhaps the Enlightenment, though in tension with organized religion, has a better title; it is clearly the immediate root of the French Declaration of the Rights of Man and of the Citizen. But at all events the 15th Amendment states a clear national commitment to universal, individual political rights regardless of race or color.
Of course conventional political discourse often uses such terms as “the black vote,” “the youth vote,” “the senior vote,” etc. But those who use these terms— politicians, their consultants, pundits, journalists — know perfectly well that they are oversimplifications, used to capture general political tendencies, not a justification for creating or assuming a political entity that functions through a demographic group’s “majority.” The Supreme Court has recognized that these generalizations are no such justification. In Shaw v. Reno, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), it confronted racial gerrymandering that took the form of including in one district persons separated by geographic and political boundaries and who “may have little in common with one another but the color of their skin.” Id. at 647, 113 S.Ct. 2816. Such a plan:
bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group — regardless of their age, education, economic status, or the community in which they live' — think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible stereotypes.

Id.

The pre-Enlightenment history of continental Europe included just such entities — “estates,” whose members voted separately from those of the other estates. Most famously, separately elected representatives of the nobility, the clergy, and the “common” people gathered in 1789 in the French Estates-General. For the last time. By the middle of that year, the Estates-General had ceased to exist. By transforming itself into a National Assembly, it precipitated the French Revolution and the permanent abolition of voting by estates, ultimately throughout Europe. The 15th Amendment can be traced back to that basic development. Section 5’s mandate to advance “the ability of any citizens of the United States on account of race or color ... to elect their preferred *905 candidates of choice ” is a partial retreat to pre-Revolutionary times, an era perhaps now so long past that its implications are forgotten.
None of this is to suggest that the country need for a minute countenance deliberate voting rule manipulations aimed at reducing the voting impact of any racial group, whether in the form of restrictions on ballot access or of boundary-drawing. And in judicial proceedings to stamp out such manipulations, it would of course be no defense for the perpetrators to say that they sought only to downweight a minority’s majority. But a congressional mandate to assure the electoral impact of any minority’s majority seems to me more of a distortion than an enforcement of the 15th Amendment’s ban on abridging the “right of citizens of the United States to vote ... on account of race, color, or previous condition of servitude.” Preventing intentional discrimination against a minority is radically different from actively encouraging racial gerrymandering in favor of the minority (really, the majority of the minority), as § 5 does. Assuming there are places in which a colorblind constitution does not suffice as a “universal constitutional principle,” Parents Involved in Community Schools v. Seattle School Dist. No. 1, 551 U.S. 701, 788, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) (opinion of Kennedy, J.), the voting booth should not be one of them.

. Given such a standard, I cannot understand how we could apply Salerno’s “no set of circumstances” test, see Maj. Op. at 883, quite apart from the test's questionable continued vitality, see, e.g., Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008). Suppose Congress had actually designed the coverage formula by having the chair of the Senate Judiciary Committee throw darts at a map and had included every jurisdiction where a dart landed. Would we be expected to reject a facial challenge simply on a showing that the behavior of one covered jurisdiction was so blatantly unconstitutional as to cry out for application of § 5?

. The discourse revolving around § 5 invariably assumes that members of a minority have virtually identical interests and preferenees. I follow that pattern here, reserving for the end of the opinion consideration of *887 how such an assumption relates to the real world and to the 15 th Amendment.

. All the charts exclude Michigan and New Hampshire, both partially covered states, because the few small townships covered constitute only a minute portion of those states and, as far as I can tell, have never been the subject of a § 5 action.

. The only covered jurisdictions excluded are Alaska, New Hampshire, and South Dakota. Of those, only Alaska is a fully covered state. The other states excluded for want of data are Hawaii, Idaho, Iowa, Kansas, Maine, Montana, Nebraska, New Mexico, North Dakota, Oregon, Rhode Island, Utah, Vermont, West Virginia, and Wyoming.

. In order to separately calculate the populations of the covered portions of partially covered states (namely, New York, California, North Carolina, and Florida), Chart V uses the county-specific population estimates from the U.S. Census Bureau. See U.S. Census Bureau, Annual Estimates of the Resident Population for Counties: April 1, 2000 to July 1, 2004, http://www.census.gov/popest/data/ counties/totals/2004/CO-EST2004-01 .html (linking to county-specific data for these states and others); Voting Section, U.S. Dep’t of Justice, Section 5 Covered Jurisdictions, http://www.justice.gov/crt/about/vot/sec_5/ covered.php (last visited May 9, 2012).

. I exclude North Carolina here because four of its ten successful suits were located in uncovered portions of the state. See Katz Master List.