## LIABILITY OF CARRIER FOR EXCESSIVE FREIGHT CHARGES DUE TO MISROUTING.

Court of Appeals for Lawrence County.

CHESAPEAKE & OHIO RAILWAY COMPANY v. THE W. G. WARD LUMBER COMPANY.

Decided, December 5, 1913.

*Railways—Connecting Carrier the Agent of the Initial Carrier, When —Liability May Be Limited by a Carrier to Its Own Line, When— Application of the Carmack Amendment Controlling Interstate Shipments.*

1. Unless controlled by legislation, the rule in Ohio is that a consignment beyond an initial carrier's line is a through contract; the connecting carrier becomes the agent of the receiving carrier and the latter is liable for the defaults of the former in the carriage of goods.

2. Subject to the same limitation, the initial carrier has the right to specially contract for a limitation of its liability to its own line; and a provision in the bill of lading, agreeing to carry to destination, if on its own road, otherwise to deliver to another carrier on the route to said destination, exempts it from damages occurring on a connecting line.

3. The Carmack amendment of June 29, 1906, of Section 20 in the act of Congress regulating interstate commerce, controls contracts of interstate shipments. Under it the reception of freight for transportation from one state to another imposes liability on the initial carrier for the whole route; and the contract becomes one for through carriage.

4. The liability imposed by said admendment for "loss, damage, or injury to property" caused by any carrier includes any damage by reason of excessive freight charges caused by misrouting by a connecting carrier.

*Henry Bannon,* for plaintiff in error.
*Johnson & Jones,* contra.

JONES (THOMAS A.), J.; WALTERS, J., and SAYRE, J., concur.

Suit was brought by the W. G. Ward Lumber Company, the consignor, in the court of common pleas, against the Chesapeake

& Ohio Railway Company, as the initial carrier of a car of lumber, which was consigned to it at Garrison, Kentucky, to. be shipped over the Chesapeake & Ohio and connecting lines to Kemptville, Ontario. The Ward Lumber Company had sold this lumber to the Canadian Pacific Railway. For convenience of billing it had billed it to Kemptville, Ontario, but routed it in care of the Canadian Pacific Railway at Detroit. The initial carrier took the car to Cincinnati, the terminus of its own line, and there delivered it, with shipper's instructions, to the Cincinnati Northern, a connecting carrier, to be shipped to its destination. The connecting carrier omitted the notation upon its way-bill that it received from its initial carrier and misrouted the car of lumber so that it reached St. Thomas, Ontario, a point which was between its origin and destination, but which was upon the line of the Canadian Pacific Railway. The original bill of lading contract between the shipper and the Chesapeake & Ohio Railway contained a notation in ink consigning the car to the "Canadian Pacific Ry. Co., c/o A. Fronhoefer, Kemptville Jct., Ont., c/o C. P. Ry. at Detroit." The way-bill of the initial carriier contained those notations with the additional notation: "Via Cn., M. C. & C. P. R. at Detroit." The Cincinnati Northern Railway, the connecting carrier, omitted from its own way-bill the notation: "Via Cn., M. C. & C. P. R. at Detroit."

The original bill of lading had the following stipulation printed therein:

"The property described below in apparent good order * * * which said company agrees to carry to the said destination, if on its road, otherwise to deliver to another carrier on the route to said destination."

It is also agreed in the printed form that every service to be performed under the bill of lading "shall be subject to all the conditions, whether printed or written, herein contained."

One of the conditions printed and endorsed on the back of the bill of lading was:

"No carrier shall be liable for loss or damage not occurring on its own road or its portion of the through route, nor after said

property is ready for delivery to the next carrier or to con-
signee.''

It appears from this record that the consignor, the lumber
company, had not only sold the car of lumber to the Canadian
Pacific Railway Company, but in order to avoid the additional
freight had noted it on the bill of lading in care of the Ca-
nadian Pacific Railway Company at Detroit. By the misrouting
of the car to St. Thomas, Ontario, a larger freight was super-
added, which the Chesapeake & Ohio Railway Company col-
lected, amounting to the sum of $96.33, the rate from Garrison,
Kentucky, to St. Thomas, Ontario. Had the car been properly
routed to the Canadian Pacific's care at Detroit the amount of
the freight would have been $51. It was for the amount of the
overcharge of $45.33 which the Cheapeake & Ohio collected that
this suit was brought by the consignor.

The foregoing facts are practically conceded in the case. The
sole question arising from this state of the record is whether,
under the facts, the Chesapeake & Ohio Railway Company, as
the initial carrier, is liable for the misrouting of the car of lum-
ber by its connecting carrier and for the additional freight by
it collected.

A large number of authorities, both text and judicial deci-
sions, as bearing upon this question have been cited by counsel
in this case.

The English rule upon this subject is, that where goods have
been consigned by a shipper to a consignee beyond the terminus
of the initial carrier the contract of affreightment is *prima facie*
a through contract and the connecting carriers became agents
of the initial carrier and their default becomes the default of the
initial carrier.

The leading English case upon this subject is found in *Mus-
champ* v. *Lancaster & Preston Junction Ry. Co.*, 8 M. & W., 421.
This case was decided in 1841.

The English rule has been followed by a minority of the
American states, and we think it can be conceded that Ohio is
found among the number of states aligning itself with the prin-
ciple adopted by the English rule. That which is known, how-

ever, as the American rule is otherwise, and that is: That when a consignment has been made beyond the terminus of the initial carrier's line, in the absence of any special contract to the contrary, the mere fact of the consignment beyond its terminus does not *ipso facto* make it a through contract, and the initial carrier becomes liable only for default upon its own line.

The latter is the rule adopted by the United States Supreme Court and by the courts of a majority of the states which have been called upon to pass upon the subject.

The English rule seems to have been applied, in principle, in the cases of *B. & O. R. R. Co.* v. *Campbell*, 36 Ohio St., 647, and *Stevens* v. *L. S. & M. S. Ry. Co.*, 20 C. C., 41.

While the foregoing may be recognized as the general rule applying to bills of lading or contracts of affreightment between consignor and consignee when shipping over connecting lines, there is no court, so far as we have been able to ascertain, whether following the American or English rule, that has not recognized the contractual right of an initial carrier to specially contract for the carriage of goods to the termination of its own route.

This principle has been unequivocally adopted in the case of *C. H. & D. Ry. Co.* v. *Pontius et al*, 19 Ohio St., 221, in that case the bill of lading contained the provision that the goods were to be transported by the initial carrier "to its terminus, and there delivered to the agents of connecting steamboats. railroad companies, or forwarding lines."

The Supreme Court held that this contract was not a through contract which would carry them to the city of New York, but was merely a contract to carry them to Dayton only, which was the terminus of the initial carrier's road. On page 237 of that case Welch, J., says:

"It was surely in the power of the parties, notwithstanding the destination of the goods, to make an express agreement that the company should only take them to Dayton. And had they undertaken to make such an agreement, they could hardly have embodied it in language more plain and direct than they have used. No case is shown, English or American, where an explicit contract like this has been held to be overruled or varied, by the

simple fact that the goods were received with the knowledge that they were consigned to a more distant point than that specified in the contract.''

The right to limit its liability for carriage to its own terminus is also recognized by Judge Okey in *Railroad Co.* v. *Campbell, supra,* wherein he says:

''Of course the carrier selling such ticket may lawfully agree with the passenger that it shall not be liable except for loss or damage occurring on its own road.''

In view of the authorities, therefore, we are of the opinion that when the initial carrier in this case contracted, by its bill of lading, and agreed ''to carry to the said destination, if on its road, otherwise to deliver to another carrier on the route to said destination,'' it exempted itself from the general rule by special contractual provision, and that its liability ended at its terminus, Cincinnati, if it delivered the goods to its connecting carrier, together with the notation of shipping instructions on its bill of lading.

The record in this case shows that there was a notation on this bill of lading that this car was to be shipped in care of the Canadian Pacific Railway Company at Detroit; it further shows that the initial carrier complied with its duty in delivering said car together with said shipping instructions, to its connecting carrier. It would seem, therefore, that in this case the Chesapeake & Ohio Railway Company acted both in the capacity of carrier and forwarder. It was to carry the goods to its terminus at Cincinnati and there deliver the same to a connecting line.

A case analogous to this in prnciple, although applied conversely, is found in *Little Miami R. R. Co.* v. *Washburn,* 22 Ohio St., 324. The first proposition of the syllabus is:

''A common carrier who undertakes to transport goods over the whole or any part of his own route, and then to forward them to a designated destination beyond, is bound to transmit with their delivery to the carrier next en route, all special instructions received by him from the consignor; and in default thereof, in any material or substantive particular, to stand re-

sponsible for, and make good, the loss to which such negligence shall have contributed.''

Our conclusion, therefore, upon the subject is that, by reason of this special provision entered into between the shipper and the Chesapeake & Ohio Railway Company, as the initial carrier, this was a contract to carry to its terminus only, and there deliver to its connecting carrier to be forwarded to destination.

This being the case, upon the facts stated, the Chesapeake & Ohio Railway Company was entitled to judgment unless the special contract has been annulled by the adoption by Congress of the Carmack amendment to Section 20 of the Hepburn law (34 U. S. Stats. at Large, 595), which reads:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company for liability hereby imposed.''

Counsel for the railway company concedes the force of the amendment only holds the initial carrier to such liability as may result from actual "loss, damage, or injury to such property;" that, since the cause of action here was for excessive freight charges caused by the misrouting of its connecting carrier, the liability for such excessive charges does not fall within the terms of the act; and that the initial carrier is not, therefore, chargeable with the dereliction of its connecting carrier.

Does the negligent act here resulting in the excessive charge come within the intendment of the act?

It is the universal rule of statutory construction that the mischief to be remedied is the greatest subject for the court's consideration when it comes to pass upon the interpretation of doubtful phrases.

What was the condition before its passage? What mischief was to be corrected, and what remedy did the legislative authority have in mind?

By the joint action of railways in the carriage of goods beyond the receiving carrier's line, there had developed a uniformity of operation between the various connecting lines, prescribing, by a common arrangement for through rates, for continuity of transportation and for a single collection by one carrier of the entire charges which were thereafter prorated among the several carriers engaged; at the same time a custom had also developed by which the initial carrier limited its liability to its own route, thus causing the shipper all of the inconvenience of locating the liability and thereafter seeking redress in a distant jurisdiction.

These and other considerations caused the action by Congress in its regulation of interstate shipments; its purpose was to stamp the contract between the shipper and the initial carrier as a through bill of lading in every case where the shipment was to be made to another state.

It would be futile to here revert to the reasons and purposes of Congress in adopting the Carmack amendment. These are found both in the speeches of the congressmen who advocated its passage and in the opinions of our highest federal judges in interpreting its scope and effect.

It has ·been held that the Carmack amendment, in all such cases of interstate shipments, has impressed upon the contract of shipment the character of a through contract and has converted every connecting carrier engaged therein as an agent of the initial carrier. The bill of lading, therefore, is a through contract of shipment, and the ordinary common-law liability arises from the negligent defaults of connecting carriers in cases of that kind.

The United States Supreme Court seems to have taken this view of the scope and effect of the act.

In the case of *The Atlantic Coast Line R. R. Co.* v. *Riverside Mills*, 219 U. S., 186-198, Justice Lurton says:

"Congress by the act here involved has declared, in substance, that the act of receiving property for transportation to a point

in another state and beyond the line of the receiving carrier shall impose on such receiving carrier the obligation of through transportation with carrier liability throughout.''

And further on he says:

''Reduced to the final result, the Congress has said that a receiving carrier, in spite of any stipulation to the contrary, shall be deemed, when it received property in one state to be transported to a point in another involving the use of a connecting carrier for some part of the way, to have adopted such other carrier as its agent, and to incur carrier liability throughout the entire route.'' * * *

And the learned justice further on emphasizes the fact that if the carrier is obliged to use connecting carriers as agents, the receiving or initial carrier must use them as its agents and not as agents of the shippers.

The foregoing case was later followed by the Supreme Court of the United States in the case of *Galveston, H. & S. A. Ry. Co.* v. *Wallace,* 223 U. S., 481, where the seventh proposition of the syllabus states:

''Under the Carmack amendment, wherever the carrier voluntarily accepts goods for shipment to a point on another line in another state, it is conclusively treated as having made a through contract, *Atlantic Coast Line* v. *Riverside Mills,* 219 U. S., 186; it thereby elects to treat its connecting carriers as its agents and the presumptions are that if goods are lost the loss results from the negligence of itself or of its agents.''

There may be some doubt as to whether the word ''loss'' in the act is related to the word ''property,'' since it is followed by a comma and by the conjunctive ''or.'' Counsel for the lumber company also insist that an excessive freight charge constitutes an indirect loss to the property, since, to the extent of the freight charge, the property is made less valuable.

Although the Carmack amendment was not involved it has been held that, in a contract for through shipment, an excessive freight charge by reason of misrouting, such as was made in this case by the connecting carrier, was a liability imposed on the

initial carrier. *Lord & Bushnell Co.* v. *Texas & N. O. R. R. Co.,* 155 Mo. App., 175; 134 S. W. Rep., 111.

In the case of *Missouri, K. & T. Ry. Co.* v. *Stark Grain Co.,* 103 Tex., 542, the Carmack amendment aforesaid was so construed as to hold the receiving carrier liable for delay in transportation only. In that case there did not seem to be any liability asked for loss, damage or injury to the property shipped.

We therefore think and conclude that the bill of lading here is converted by the amendment into a through-carriage contract, and is impressed with the common-law obligations resulting therefrom; that the default of its connecting carrier in misrouting the lumber was the default of an agent of the defendant below. The defendant, therefore, is liable in this case.

The judgment of the lower court is affirmed without penalty and the cause remanded for execution.

Judgment affirmed.