Per Curiam.
The 2010 census showed an enormous increase in Texas’ population, with over four million new residents. That growth required the State to redraw its electoral districts for the United States Congress, the State Senate, and the State House of Representatives, in order to comply with the Constitution’s one-person, one-vote rule. See Georgia v. Ashcroft, 539 U. S. 461, 488, n. 2 (2003). The State also had to create new districts for the four additional congressional seats it received.
Texas is a “covered jurisdiction” under § 5 of the Voting Rights Act of 1965. See 79 Stat. 439, 42 U. S. C. § 1973c(a); 28 CFR pt. 51, App. (2011). Section 5 suspends all changes to a covered jurisdiction’s election procedures, including dis­trict lines, until those changes are submitted to and approved by a three-judge United States District Court for the Dis­trict of Columbia, or the Attorney General. See Northwest Austin Municipal Util. Dist. No. One v. Holder, 557 U. S. 193, 198 (2009). This process, known as preclearance, re­ *391 quires the covered jurisdiction to demonstrate that its pro­posed change “neither has the purpose nor will have the ef­fect of denying or abridging the right to vote on account of race or color.” §1973c(a). This Court has been emphatic that a new electoral map cannot be used to conduct an elec­tion until it has been precleared. See, e. g., Clark v. Roemer, 500 U. S. 646, 652 (1991).
The day after completing its new electoral plans, Texas submitted them to the United States District Court for the District of Columbia for preclearance. The preclearance process remains ongoing. Texas was unsuccessful in its bid for summary judgment, and a trial is scheduled in the coming weeks. Meanwhile, various plaintiffs — appellees here— brought suit in Texas, claiming that the State’s newly enacted plans violate the United States Constitution and § 2 of the Voting Rights Act.[1] Appellees alleged, inter alia, that Texas’ enacted plans discriminate against Latinos and African-Americans and dilute their voting strength, notwith­standing the fact that Latinos and African-Americans ac­counted for three-quarters of Texas’ population growth since 2000. A three-judge panel of the United States District Court for the Western District of Texas was convened. See 28 U. S. C. § 2284. That court heard argument and held a trial with respect to the plaintiffs’ claims, but withheld judg­ment pending resolution of the preclearance process in the D. C. court. Cf. Branch v. Smith, 538 U. S. 254, 283-285 (2003) (Kennedy, J., concurring).
As Texas’ 2012 primaries approached, it became increas­ingly likely that the State’s newly enacted plans would not receive preclearance in time for the 2012 elections. And the State’s old district lines could not be used, because popula­tion growth had rendered them inconsistent with the Consti­ *392 tution’s one-person, one-vote requirement. It thus fell to the District Court in Texas to devise interim plans for the State’s 2012 primaries and elections. See Connor v. Finch, 431 U. S. 407, 414-415 (1977). After receiving proposals from the parties and holding extensive hearings, that court issued its interim plans. The court unanimously agreed on an interim State Senate plan, but Judge Smith dissented with respect to the congressional and State House plans. Texas asked this Court to stay the interim plans pending an appeal, arguing that they were unnecessarily inconsistent with the State’s enacted plans. This Court granted the stay and noted probable jurisdiction. Post, p. 1090.
Redistricting is “primarily the duty and responsibility of the State.” Chapman v. Meier, 420 U. S. 1, 27 (1975). The failure of a State’s newly enacted plan to gain preclearance prior to an upcoming election does not, by itself, require a court to take up the state legislature’s task. That is be­cause, in most circumstances, the State’s last enacted plan simply remains in effect until the new plan receives preclear­ance. But if an intervening event — most commonly, as here, a census — renders the current plan unusable, a court must undertake the “unwelcome obligation” of creating an interim plan. Connor, supra, at 415. Even then, the plan already in effect may give sufficient structure to the court’s en­deavor. Where shifts in a State’s population have been rela­tively small, a court may need to make only minor or obvious adjustments to the State’s existing districts in order to de­vise an interim plan.
But here the scale of Texas’ population growth appears to require sweeping changes to the State’s current districts. In areas where population shifts are so large that no sem­blance of the existing plan’s district lines can be used, that plan offers little guidance to a court drawing an interim map. The problem is perhaps most obvious in adding new congressional districts: The old plan gives no suggestion as to where those new districts should be placed. In addition, *393 experience has shown the difficulty of defining neutral legal principles in this area, for redistricting ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judg­ment. See, e.g., Miller,v. Johnson, 515 U. S. 900, 915-916 (1995); White v. Weiser, 412 U. S. 783, 795-796 (1973). Thus, if the old state districts were the only source to which a district court could look, it would be forced to make the sort of policy judgments for which courts are, at best, ill suited.
To avoid being compelled to make such otherwise stand-­ardless decisions, a district court should take guidance from the State’s recently enacted plan in drafting an interim plan. That plan reflects the State’s policy judgments on where to place new districts and how to shift existing ones in response to massive population growth. This Court has observed be­fore that “faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying” a state plan — even one that was itself unenforceable — “to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.” Abrams v. Johnson, 521 U. S. 74, 79 (1997) (holding that the District Court properly declined to defer to a precleared plan that used race as a predominant factor). For example, in White, supra, an equal population challenge, this Court reversed a District Court’s choice of interim plan and required the District Court to choose a plan more closely resembling an enacted state plan, even though the state plan itself had been held to violate the one-person, one-vote prin­ciple. Similarly, in Upham v. Seamon, 456 U. S. 37 (1982) (per curiam), although the state plan as a whole had been denied § 5 preclearance, this Court directed a District Court to “defer to the legislative judgments the [state] plans re­flect,” insofar as they involved districts found to meet the preclearance standard. Id., at 40-41. See also Whitcomb v. Chavis, 403 U. S. 124, 160-161 (1971) (equal protection challenge).
*394 Section 5 prevents a state plan from being implemented if it has not been precleared. But that does not mean that the plan is of no account or that the policy judgments it reflects can be disregarded by a district court drawing an interim plan. On the contrary, the state plan serves as a start­ing point for the district court. It provides important guid­ance that helps ensure that the district court appropriately confines itself to drawing interim maps that comply with the Constitution and the Voting Rights Act, without displac­ing legitimate state policy judgments with the court’s own preferences.
A district court making such use of a State’s plan must, of course, take care not to incorporate into the interim plan any legal defects in the state plan. See Abrams, supra, at 85-­86; White, supra, at 797. Where a State’s plan faces chal­lenges under the Constitution or § 2 of the Voting Rights Act, a district court should still be guided by that plan, except to the extent those legal challenges are shown to have a like­lihood of success on the merits. Plaintiffs seeking a prelim­inary injunction of a statute must normally demonstrate that they are likely to succeed on the merits of their challenge to that law. See Winter v. Natural Resources Defense Council, Inc., 555 U. S. 7, 20 (2008). There is no reason that plaintiffs seeking to defeat the policies behind a State’s redis­tricting legislation should not also have to meet that stand­ard. And because the local district court — here, the District Court for the Western District of Texas — will ultimately de­cide the merits of claims under §2 and the Constitution, it is well equipped to apply that familiar standard.
The calculus with respect to §5 challenges is somewhat different. Where a State has sought preclearance in the District Court for the District of Columbia, § 5 allows only that court to determine whether the state plan complies with § 5. Consistent with that design, we have made clear that other district courts may not address the merits of § 5 chal­lenges. See, e. g., Perkins v. Matthews, 400 U. S. 379, 385 *395 (1971). The local district court drafting an interim plan must therefore be careful not to prejudge the merits of the preclearance proceedings. The court should presume nei­ther that a State’s effort to preclear its plan will succeed nor that it will fail.
The need to avoid prejudging the merits of preclearance is satisfied by taking guidance from a State’s policy judgments unless they reflect aspects of the state plan that stand a rea­sonable probability of failing to gain § 5 preclearance. And by “reasonable probability” this Court means in this context that the §5 challenge is not insubstantial. That standard ensures that a district court is not deprived of important guidance provided by a state plan due to § 5 challenges that have no reasonable probability of success but still respects the jurisdiction and prerogative of those responsible for the preclearance determination. And the reasonable probabil­ity standard adequately balances the unique preclearance scheme with the State’s sovereignty and a district court’s need for policy guidance in constructing an interim map. This Court recently noted the “serious constitutional ques­tions” raised by § 5’s intrusion on state sovereignty. North­west Austin, 557 U. S., at 204. Those concerns would only be exacerbated if § 5 required a district court to wholly ig­nore the State’s policies in drawing maps that will govern a State’s elections, without any reason to believe those state policies are unlawful.
Appellees, however, contend that § 5 demands exactly that. In their view, this Court’s precedents require district courts to ignore any state plan that has not received §5 preclear­ance. But the cases upon which appellees rely hold only that a district court may not adopt an unprecleared plan as its own. See Lopez v. Monterey County, 519 U. S. 9 (1996); McDaniel v. Sanchez, 452 U. S. 130 (1981). They say noth­ing about whether a district court may take guidance from the lawful policies incorporated in such a plan for aid in drawing an interim map. Indeed, in Upham this Court or­ *396 dered a District Court to defer to the unobjectionable as­pects of a State’s plan even though that plan had already been denied preclearance.
In this litigation, the District Court stated that it had “giv[en] effect to as much of the policy judgments in the Leg­islature’s enacted map as possible.” 1 App. 182. At the same time, however, the court said that it was required to draw an “independent map” following “neutral principles that advance the interest of the collective public good.” Id., at 169-170. In the court’s view, it “was not required to give any deference to the Legislature’s enacted plan,” and it in­stead applied principles that it determined “place the inter­ests of the citizens of Texas first.” Id., at 171. To the ex­tent the District Court exceeded its mission to draw interim maps that do not violate the Constitution or the Voting Rights Act, and substituted its own concept of “the collective public good” for the Texas Legislature’s determination of which policies serve “the interests of the citizens of Texas,” the court erred.
In proclaiming its ability to draw an interim map “without regard to political considerations,” the District Court relied heavily on Balderas v. Texas, No. 6:01cvl58, 2001 U. S. Dist. LEXIS 25740 (ED Tex., Nov. 14, 2001) (per curiam), sum­marily aff’d, 536 U. S. 919 (2002). 1 App. 182. But in Bald-­eras there was no recently enacted state plan to which the District Court could turn. Without the benefit of legislative guidance in making distinctly legislative policy judgments, the Balderas court was perhaps compelled to design an in­terim map based on its own notion of the public good. Be­cause the District Court here had the benefit of a recently enacted plan to assist it, the court had neither the need nor the license to cast aside that vital aid.
Some specific aspects of the District Court’s plans seem to pay adequate attention to the State’s policies, others do not, and the propriety of still others is unclear. For example, in drawing State House districts in north and east Texas, the *397 District Court closely followed the State’s policies. See 1 App. 173; 5 id., at 25-26. Although Texas’ entire State House plan is challenged in the § 5 proceedings, there is ap­parently no serious allegation that the district lines in north and east Texas have a discriminatory intent or effect. 1 id., at 187, n. 4. The District Court was thus correct to take guidance from the State’s plan in drawing the interim map for those regions. But the court then altered those districts to achieve de minimis population variations — even though there was no claim that the population variations in those districts were unlawful. Id., at 171, and n. 8. In the ab­sence of any legal flaw in this respect in the State’s plan, the District Court had no basis to modify that plan.[2]
The District Court also erred in refusing to split voting precincts (called “voter tabulation districts” in Texas) in drawing the interim plans. Id., at 90,102-103. That choice alone prevented the District Court from following the lead of Texas’ enacted plan — which freely splits precincts — in many areas where there were no legal challenges to the plan’s de­tails. See id., at 102-103, 116, n. 24. The District Court was apparently motivated by a well-intentioned desire to save Texas the time and expense of reconfiguring precincts, and to ensure that the court’s interim plan could be imple­mented in time for the upcoming election. Id., at 90, 102-­103,109. But the State’s plan accepted the costs of splitting precincts in order to accomplish other goals, and Texas law expressly allows recasting precincts when redistricting. See Tex. Elec. Code Ann. §42.032 (West 2010). If a State has chosen to accept the burden of changing its precincts, *398 and its decision to do so is otherwise lawful, there is no warrant for a district court to ignore the State’s decision. Of course, in these cases it may well be that Texas will re­examine this issue in light of the exigencies caused by the impending election.
The District Court also appears to have unnecessarily ig­nored the State’s plans in drawing certain individual dis­tricts. For example, the District Court drew an interim District 77 that resembles neither the State’s newly enacted plan, nor the previous plan in effect prior to the 2010 census. The court said that it did so in response to alleged constitu­tional violations. 1 App. 174-175. But the court did not say that those allegations were plausible, much less likely to succeed. Nor did the District Court rely on a finding that the relevant aspects of the state plan stood a reasonable probability of failing to gain § 5 preclearance, see supra, at 395. Without such a determination, the District Court had no basis for drawing a district that does not resemble any legislatively enacted plan.
The court’s approach in drawing other districts was un­clear. The interim plan’s Congressional District 33, for ex­ample, disregards aspects of the State’s plan that appear to be subject to strong challenges in the § 5 proceeding. See 3 App. 600-601; 5 id., at 12-14. That much seems appro­priate, but there are grounds for concern with the path the District Court followed from there. The court’s order sug­gests that it may have intentionally drawn District 33 as a “minority coalition opportunity district” in which the court expected two different minority groups to band together to form an electoral majority. 1 id., at 147. The order is somewhat ambiguous on this point — some portions suggest that the court deliberately designed such a district, other parts suggest that it drew the district solely as a response to population growth in the area. Compare id., at 146-147 (“Because much of the growth that occurred in the Dallas-­Fort Worth metroplex was attributable to minorities, the *399 new district 33 was drawn as a minority coalition opportu­nity district”), with id., at 144 (“The Court has nowhere ex­pressly sought to increase the performance of any opportu­nity district above benchmark”). If the District Court did set out to create a minority coalition district, rather than drawing a district that simply reflected population growth, it had no basis for doing so. Cf. Bartlett v. Strickland, 556 U. S. 1, 13-15 (2009) (plurality opinion).
Because it is unclear whether the District Court for the Western District of Texas followed the appropriate stand­ards in drawing interim maps for the 2012 Texas elections, the orders implementing those maps are vacated, and the cases are remanded for further proceedings consistent with this opinion.
The judgment shall issue forthwith.

It is so ordered.

 Section 2 prohibits “any State or political subdivision” from imposing any electoral practice “which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.” 42 U. S. C. § 1973(a).

 This Court has stated that court-drawn maps are held to a higher standard of acceptable population variation than legislatively enacted maps. See, e. g., Abrams v. Johnson, 521 U. S. 74, 98 (1997). But this Court has also explained that those “stricter standard[s]” are not trig­gered where a district court incorporates unchallenged portions of a State’s map into an interim map. Upham v. Seamon, 456 U. S. 37, 42-43 (1982) (per curiam).